Filed 6/27/24  N.N. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| N.N.,<br><br>　　　Petitioner,<br><br>v.<br><br>CONTRA COSTA COUNTY<br>SUPERIOR COURT,<br><br>　　　Respondent;<br><br><br>CONTRA COSTA COUNTY<br>CHILDREN & FAMILY SERVICES<br>BUREAU, et al.,<br><br>　　　Real Parties in Interest. | A169941<br><br>(Contra Costa County<br>Super. Ct. No. J2200562) |

N.N., the presumed father of nineteen-month-old K.N., petitions for extraordinary relief to overturn an order entered at a combined six-month/twelve-month review hearing terminating his reunification services and setting the matter for a hearing under Welfare and Institutions Code section 366.26.  He raises several issues.  We conclude there is no substantial evidence that returning K.N. to his custody would be detrimental.  We also conclude father was not provided reasonable reunification services due to the

1

unreasonably limited visitation he was afforded, which never progressed past the point of supervised visitation. Accordingly, we grant the petition.

## BACKGROUND

K.N. came to the attention of the Contra Costa County Children Family Services Bureau (the Bureau) at birth, when the Bureau received a report that her mother tested positive for methamphetamine and nearly died during childbirth due to complications from chronic drug use.

At the time, there were open dependency proceedings pending concerning K.N.'s two older siblings that the Bureau had initiated two years earlier when the younger of the two siblings was born, because then too mother had tested positive for methamphetamines (and so had the baby). K.N.'s siblings had been declared dependents, and their cases had been transferred from Contra Costa County to Madera County where the proceedings had been pending for about a year and a half. At the time of the referral concerning K.N., a hearing had been set in Madera County to terminate mother's and father's parental rights over the two older siblings (then toddlers, ages 2 and 3).

Father and mother did not live together. Mother lived in Antioch, California with a friend and father lived in Coarsegold, California with mother's father.

Father, who was present at the hospital when the referral was investigated, reported to the emergency response social worker that he no longer did drugs and had tested clean for over a year in the other dependency case, and expressed disbelief that mother had a positive toxicology report because he had been told she had tested negative. He reported having previously used methamphetamine and cannabis which had been the reason for the open dependency case in Madera County, told the social worker he

2

had been in denial about his substance abuse for the first year and a half of the other case but also reported having completed a parenting class and substance abuse counseling and said he had been consistently testing negative in his drug tests. He said he had been unaware of mother's drug use, because she had moved to Antioch about a year earlier.

A dependency petition was filed on November 15, 2022, the allegations of which we address below, and K.N. was ordered detained. According to the detention report, the safety risk father posed was that he had "admitted to past substance use (methamphetamine and cannabis) which led to CFS involvement and he is currently working on reuniting with [the two older siblings]," the other dependency case was nearing a hearing to terminate his parental rights, and "[i]t is uncertain if either parent will be able to protect the baby from physical harm and provide the care and attention a newborn requires after being discharged from the hospital" and so "there is insufficient evidence to indicate that [K.N.] will be safe if she is released to the care of her parents."

At the detention hearing, father was elevated to presumed father status and the juvenile court authorized the Bureau to release K.N. to his custody with 72 hours' notice to the minor's attorney.

That did not happen. K.N. was placed with her maternal grandmother, where she would remain for the duration of the case.

At the time of the disposition report, father was dividing his time between living in Coarsegold, California with mother's father, which he said was his permanent home, and Antioch where he would stay with members of mother's family. He worked in the construction industry and reportedly couldn't find work in Coarsegold but could in Antioch.

In its disposition report, the Bureau articulated no specific danger of returning K.N. to father's custody. It reported he had two older children with another woman (his high school sweetheart) with whom he was able to co-parent effectively, had family supports and was employed. It also reported positively about father's visits with K.N., with whom he was visiting regularly. He had completed all his case requirements in Madera County including a parenting class and a nine-month outpatient drug treatment program, and he continued to randomly drug test there. A hospital social worker also reported that father had been visiting and caring for K.N. in the hospital daily, including beyond visitor's hours, there had been no issues, and he displayed the ability to care for the newborn.

The Bureau had been unable to verify whether father was still testing clean for drugs, however.[1] And the absence of current drug test results was the only current concern the Bureau articulated about father in its disposition report which was, on the whole, positive. It wrote he had "shown his desire and ability to make behavioral changes" by completing a parenting class and outpatient drug program, "does not present with any mental health concerns and has been in consistent contact" with the social worker. But it wrote he "has not been cooperative with [drug] testing," and so the Bureau recommended he be ordered to undergo random drug testing in Contra Costa

---

[1] The social worker had requested his test results from Madera County so he wouldn't have to drug test in both counties, but Madera County wouldn't provide his current drug test results. Thus, the social worker asked him to also drug test in Contra Costa County. Father missed two months of weekly drug testing in Contra Costa County and told the Bureau he was too busy to test in both counties but that he gave all his drug test results to his attorney from Madera County which he thought should suffice.

County to "provide proof that substances are not being utilized."[2] The Bureau expressed "hope that over an extended period of time he takes advantage of [unspecified] resources and family support to assist with independence and will eventually reunify with [K.N.]"

The Bureau recommended bypassing reunification services for mother. It recommended father receive reunification services but did not recommend returning K.N. to his custody. The Bureau wrote that placing K.N. with father at disposition "is a safety concern" only "because [he] has a prior juvenile dependency [case]" in Madera County concerning the two older siblings in which his family reunification services were terminated "and Madera County has recommended termination of his parental rights."

The juvenile court subsequently held a three-day, combined, contested jurisdiction/disposition hearing (on March 15, May 3 and May 10, 2023). By this point, his parental rights had been terminated in the other case. Father testified at the jurisdiction hearing he was currently living with mother in her relatives' homes. He testified he hadn't been living with her during the pregnancy, and only found out she was pregnant when she was about six months into the pregnancy.

In a subsequent update to the court for the continued hearing, the Bureau reported that father and mother were "in a relationship" but no longer living together.

At the jurisdiction portion of the hearing, the only allegations concerning father the juvenile court sustained were general allegations that

---

[2] In a subsequent update prepared before the contested jurisdiction/disposition hearing, the Bureau reported it had received the Madera County drug test results from father's attorney yet still wanted him to drug test in both counties and he indicated his willingness to do so. Some of his subsequent tests were positive for the presence of cannabis.

he had failed to reunify with the two older siblings due to his substance abuse problems, and his family reunification services had been terminated almost a year and a half earlier (on January 1, 2022). The petition did not allege any specific factual details of the siblings' dependency cases nor that any specific aspect of their cases or circumstances posed a current risk to N.N., and the juvenile court made no such findings.

The juvenile court found untrue—and dismissed—allegations that father posed a risk to N.N. due to a *current* serious substance abuse problem with methamphetamines and cannabis. It also found untrue—and dismissed—allegations he lacked proper provisions for the child's care and a safe and stable living environment for the child.

At the disposition portion of the contested hearing, which culminated on May 10, 2023, the social worker testified that his visits had all been "going well," and there was no reason his visits had not previously been increased other than the fact he had not asked for increased visitation.[3] She also testified she'd been surprised by father's testimony he was living with mother, circumstances of which the social worker had not been aware, and had previously expressed concerns to father about his relationship with mother. Although father had assured the social worker he would be willing to live apart from mother and follow all court orders, the social worker was concerned about his ability to recognize whether mother was doing drugs, follow court orders and ensure K.N.'s safety. Her concern was based principally on father's continued belief mother had not been doing drugs while pregnant, as well as his belief she was currently undergoing drug treatment when in fact mother's participation was inconsistent.

---

[3] On our own motion we have taken judicial notice of that hearing transcript.

The court declined to return K.N. to father's custody and ordered reunification services for father, including co-dependency counseling. He was granted four hours of weekly visitation which "may be" supervised by the Bureau or its designee. In addition, the juvenile court gave the Bureau discretion to allow him to have overnight visits for up to two consecutive nights with K.N.

In its six-month report, the Bureau recommended terminating father's reunification services. It reported that father had been regularly visiting K.N. twice a week for two hours, supervised by the maternal grandmother in her home, and had complied with many aspects of his case plan objectives, including continuing to test negative for illegal drugs, demonstrating his ability to care for K.N. in an age-appropriate way, and meeting all her needs during supervised visitation. Based on observations during one of the supervised visitations, the Bureau wrote "[i]t was evident that [father] has experience with children. He was confident in handling [K.N.'s] needs during the entire visit." It wrote that during visits, he "takes responsibility for [K.N.'s] evening routine that includes feeding, changing, bathing, and putting her to bed. They also play." It further observed that K.N. "recognizes [father] and appeared comfortable in his presence." It also reported that during all K.N.'s visits, she "appeared healthy, was always smiling, looking around, and playful." And she called him "dada."

But the Bureau reported father fell short of his case plan goals in other ways. It reported he lacked stable housing, did not understand why K.N. was removed from his custody, did not usually reach out to the social worker on his own to initiate contact as he had been ordered to do as part of his case plan, was gainfully employed full-time as a construction worker but "has not

7

provided information about his pay"; and continued to use marijuana yet "does not see his marijuana use as a safety concern."

During a supervised visit the social worker had attended, the social worker raised the subject of his medical marijuana use with him "[w]ith his permission" and discussed "creating a safety plan since [K.N.] was very young." He subsequently contacted the social worker asking for help to develop one " 'so that I know what I'm needing to say and what I need to do to get it started.' " (Italics omitted.) The social worker responded by sending him a "safety planning template" and told him "it was not about knowing what answers to put in the boxes, but it was about understanding the danger/risk and having an action plan he would stick to and use."

In its six-month report, the Bureau again expressed concern that father had a "co-dependent" relationship with mother. No real specifics were provided. It reported only that the social worker had asked the maternal grandmother (K.N.'s caretaker) "if she had any concerns about the parents' co-dependency relationship." The grandmother reportedly knew nothing about their relationship except that father drove mother to her visits with K.N. The grandmother also "does worry about [father's] instability and any difficulties or challenges it might pose for [K.N.'s] overall safety and well-being." Mother, who by this point was not participating in any drug treatment program but still looking for an inpatient program and had moved to Madera County, reported her car had broken down and so she was getting rides from father to attend visitation, renting a hotel room when she was in Contra Costa County for visits, and the two did not stay together when she was in town for visits. "She then added that [father] was not allowed to date anyone and that she was also not allowed to date anyone either, but the two of them are not together '*like that*' and have not been a couple for the past

8

two years." The Bureau reported the social worker provided father with referrals to local "co-dependency . . . groups" and he agreed to pick one that would best suit his "needs." The social worker also gave him the option of signing up for individual therapy to "discuss his co-dependency issues" and he agreed to investigate that option too using his Medi-Cal benefits.

The social worker met with father shortly before the six-month hearing and tried to discuss creating a safety plan with him around his marijuana use, but aborted the discussion because father did not view his medical marijuana use as a safety issue. He told the social worker he had been using it twice daily for back pain (in the morning and before bed), had obtained a medical marijuana card from a local dispensary, was not using it under the supervision of a doctor, did not want to be ordered to reduce his use, and that his use of marijuana for medical purposes did not interfere with his ability to work, had never affected his other children and would not affect his ability to care for K.N. or pose any safety issue for her. He also identified three people he could call for help if needed and agreed not to drive under the influence. Nevertheless, the social worker "stopped producing the safety plan document because it was evident [he] did not see his marijuana use as a safety issue." The social worker also spoke with his mother who also had no concerns about his medical marijuana use and reported he had been using it for a long time to treat back pain from a motorcycle accident.

The case eventually proceeded to a combined six/twelve-month review hearing. By the end of the twelve-month review period, father had been participating in a co-dependency support group and still regularly testing positive for marijuana. He was still visiting regularly with K.N. (supervised by the maternal grandmother), his visits were reportedly "*going great*" and K.N. still recognized him as "*dada.*" The maternal grandmother even sent

9

the social worker a video of the two playing together during one visit, in which the social worker described K.N. as "appearing engaged and laughing so much." The Bureau continued to recommend terminating his services, at this point focusing largely on concerns over his "co-dependent" relationship with mother and his continued belief she had not used drugs while pregnant. It expressed concern that "the two reportedly do not live in the same residence, but they continue to communicate and be supportive of one another. This information has been consistent and unchanged. [They] have not resided in the same home since the siblings' dependency in Madera [County], yet they still conceived [K.N.] two months after [mother] moved back to Contra Costa. [Father] should not allow [mother] access to [K.N.] outside of supervised visitation. There is no evidence to support, and no trust established, that [father] will be protective and keep [K.N.] from [mother] at this time." It did not report that father believed mother had no ongoing problem with drugs, believed she should be permitted to have unsupervised access to K.N., or had acted in any way that suggested he would be likely to defy a court order precluding him from allowing mother to visit with K.N. while under the influence of drugs. Nor did it report any information about father's medical marijuana use apart from his positive test results.

The case proceeded to a contested hearing at which only the social worker testified, and father introduced a number of exhibits including a proposed safety plan to ensure K.N.'s safety in his custody. At the conclusion of the hearing, his counsel argued both that there was insufficient evidence of a substantial risk to K.N. if she were returned to his custody and that his reunification services had not been adequate. The juvenile court declined to return K.N. to his custody, terminated father's reunification services and set

the case for a hearing under section 366.26. Father then filed this writ petition, and we subsequently stayed the hearing.

## DISCUSSION

Father raises several issues. He contends K.N. should have been returned to him at the twelve-month review hearing because the Bureau failed to meet its burden to prove that there was a substantial danger to her. He also argues he was not provided reasonable services because his visitation was never increased, and, alternatively, that his services should have been extended. We agree with his first two contentions and do not reach the third.

## I.
### *The Juvenile Court Erred In Declining to Return K.N. to Father's Custody.*

At the twelve-month review hearing, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (Welf. & Inst. Code, § 366.21, subd. (f)(1).)

The standard is a high one. (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 856, 864 (*Georgeanne G*).) "[T]he risk of detriment must be *substantial,* such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) The standard does not require perfection, including in compliance with services. (See *ibid.*; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789-790; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.) "We are looking for passing grades here, not straight A's." (*David B.,* at p. 790.)

11

In evaluating whether there is a substantial risk of detriment, moreover, the court must consider whether the child can be safely returned to parental custody with the provision of family maintenance services and/or appropriate safeguards, such as conditions on where the parent and child may reside or issuance of no-contact orders (see, e.g., *L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1039 & fn. 8 (*L.C.*) [detriment finding not supported by substantial evidence where alternatives existed]; *Georgeanne G., supra*, 53 Cal.App.5th at p. 869-870 [similar].)

We review the court's detriment finding for substantial evidence, reviewing the evidence in the light most favorable to the Bureau and resolving all conflicts and indulging all reasonable inferences in support of the court's ruling. (*L.C., supra*, 98 Cal.App.5th at p. 1034; *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) Nevertheless, a finding of substantial detriment must be based on evidence, not speculation. In determining whether a minor can safely be returned to parental custody, " '[p]erceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence.' " (*L.C.*, at p. 1037.)

Here, the juvenile court found that K.N. could not be safely returned to father's custody for two reasons: (1) his "co-dependent" relationship with mother, and (2) his regular use of medical marijuana. Father argues neither posed a substantial danger to K.N., and we agree.

Starting first with the "co-dependency" issue, we note that "co-dependency" is not a legal basis for dependency jurisdiction. It is a somewhat vague, catchall term that the juvenile court and the Bureau used liberally below as shorthand for more particular concerns about father's relationship with mother. In its ruling, the juvenile court articulated two concerns falling under this rubric: (1) he was in continued denial that mother had been using

drugs during her pregnancy, as evidenced by his continued questioning of her positive toxicology report; and (2) he lacked "awareness and appreciation for the risks" posed by mother's continued drug use. The court expressed the view that father's co-dependency was "a huge problem in this case" and "presents a clear and present danger to [K.N.] going forward if father doesn't understand and appreciate the risks that come with his association with mother."

Father argues it was speculative to assume that he would not be able to maintain appropriate boundaries with mother if K.N. were returned to his custody. We agree. As father points out, there is no evidence mother ever violated the rules of visitation or showed up unannounced to visits. There also is no evidence mother ever showed up to visits under the influence under drugs; on the contrary, by the time of the 12-month review hearing her visits had been increased. Nor, therefore, is there any evidence that father failed to recognize that mother appeared to be under the influence of drugs at any visit.

Furthermore, the social worker never articulated any *specific* reason for fearing that father would allow mother to have contact with K.N. while under the influence of drugs. She testified vaguely she didn't think father would be able to maintain appropriate boundaries with mother but gave no explanation of why. She also expressed concern that he intended to move back into the home of mother's father which she didn't think was "the right thing to do" because it would displace mother from her current living situation.[4] The social worker also criticized father because, after attending seven sessions of co-dependency counseling in which he'd been ordered to

---

[4] Mother was willing to move out of her father's home to allow this to happen and had an alternative housing option.

13

participate, he didn't think he had a "co-dependency issue," was unsure what he was supposed to be learning from the support group and still felt frustrated that there had been an "injustice." None of these vague criticisms, alone or in combination, is substantial evidence that if K.N. were returned to father's custody she would be in substantial danger of suffering harm (physical or otherwise) because of mother's drug problems. The juvenile court did not exercise jurisdiction on the basis of "co-dependency." And, indeed, we ourselves find the Bureau's use of that term throughout this record vague and unilluminating; used in isolation, it conveys nothing about any specific safety risk posed by father's conduct. It is therefore understandable that father was puzzled by the Bureau's concern he had a "co-dependency" problem and was unsure what to make of the classes he was ordered to attend.

Furthermore, father submitted a safety plan that required him, among other things, to follow all visitation rules and court orders and not allow mother to visit K.N. unsupervised or under the influence of drugs. Any concerns that he might not abide by the plan he had proposed were purely speculative. There is no evidence he had violated any of the rules of visitation during the case or any of the court's prior orders. Nor did the social worker testify that she thought there was any risk he would knowingly or intentionally violate his own safety plan. She just testified she didn't think he would abide by it because she doubted he would be able to tell if mother was under the influence of drugs given the fact he disputed the validity of mother's drug test at K.N.'s birth. But even that concern was unfounded: his proposed safety plan enumerated specific signs of possible drug use or relapse

14

by mother that he was required to be on the lookout for,[5] and there is no basis in the evidentiary record to infer that he would be unable to do so. In addition, there is no evidence in the record father observed mother under the influence of drugs during her pregnancy; thus, the social worker's assumption he overlooked signs of her drug use at the time of K.N.'s birth had no demonstrable basis in the record and was speculative.

It was the Bureau's burden to prove detriment, not father's burden to disprove it. Here, mother had not even been living in the same county as father. The two sometimes spoke on the phone but the social worker acknowledged that their phone contact was not a problem. One cannot infer a risk to K.N. from the mere fact that father and mother were still in contact with each other, or even that they still cared about each other.

*Georgeanne C.*, *supra*, 53 Cal.App.5th 856, cited by father, is closely on point. In that case, the juvenile court declined at an 18-month review hearing to return a child to the custody of a parent who was enmeshed in a co-dependent relationship with an adult who posed a risk to her child (her boyfriend, who was a convicted perpetrator of domestic violence). And, unlike father, the mother in that case had previously violated a no-contact order and *lived with and continued to maintain an intimate relationship with the dangerous boyfriend.* (See *id.* at pp. 860, 862, 863.) Nonetheless, the appellate court held the juvenile court had erred and vacated the order, concluding the child could safely be returned to her custody with appropriate safeguards in place. Noting that "a finding of risk of harm to a child must be

---

[5] Specifically, "1. Changes in [mother's] physical appearance such as weight loss, pale complexion, and/or poor complexion; [¶] 2. Neglecting her physical appearance; [¶] 3. Increased symptoms of anxiety and generally more anxious behavior like inability to sit still, inability to stop fidgeting, and unable to focus her thoughts on one topic."

based on more than conjecture or a theoretical concern," the court reasoned that any risk the mother would violate a no-contact order concerning her boyfriend was speculative because, even though she hoped they all could be a family, she had undergone domestic violence counseling as part of her case plan, testified she would abide by all visitation rules and a no-contact order even though she didn't think it was necessary, and "nothing in the record suggested" she did not "understand the importance of complying with" such an order. (*Id*. at pp. 869, 870.)

The same is true here. The only reasonable inference from father's submission of the safety plan is that he intended to abide by it, including by paying attention to specific indicators that mother was under the influence of drugs. And, as in *Georgeanne G.*, nothing in the record suggests he did not understand the importance of abiding by a court-ordered safety plan. Moreover, he testified at the combined jurisdiction/disposition hearing that he would comply with all court orders; would not allow mother to visit K.N. unsupervised; agreed that parental drug abuse poses a safety danger to children and would not allow K.N. to be around someone actively using drugs; could "definitely" recognize the signs of mother's drug use; and would not allow her to have any contact with K.N. if she were under the influence of drugs. As in *Georgeanne G.*, here the Bureau's safety concerns depended on multiple inferences, none of which had any basis in the evidence and thus were speculative. Its concern that mother would attempt to visit K.N. while under the influence of drugs, which had never occurred during these proceedings, was based on speculation. The same is true of its concern that father would not respond appropriately and/or violate a no-contact order or other court-ordered restrictions on mother's contact with K.N. (See *Georgeanne C., supra,* 53 Cal.App.5th at p. 868.) Like the agency in

*Georgeanne C.*, in this case the Bureau relied on speculative inferences and failed to meet its burden of proffering *evidence* demonstrating K.N. cannot be safely returned to father's custody with appropriate safeguards in place to protect her from any theoretical risk posed by mother. (See *id.* at p. 870.)

This brings us to father's medical marijuana use, the second stated basis for the court's finding of a substantial risk of detriment. Our dependency scheme does not equate parental substance use itself with creating a substantial risk of danger to a child. To bring a child within the jurisdiction of the dependency court, a parent's substance use "must make the parent or guardian unable to provide regular care for a child and lead to serious physical harm to the child, or a substantial risk of such harm." (*In re N.R.* (2023) 15 Cal.5th 520, 546; see also *id.* at p. 550.) For example, our Supreme Court has cited approvingly caselaw that declined to exercise dependency jurisdiction where a father regularly used medical marijuana where there was no substantial evidence his regular marijuana use made him unable to provide regular care for his child or placed the child at substantial risk of serious physical harm or illness. (See *id.* at p. 550, discussing *In re Drake M.* (2012) 211 Cal.App.4th 754.) From this, it follows that parental drug use, without more, is not substantial evidence of a substantial risk of detriment that precludes the return of a child to parental custody. It makes no sense to forbid *the exercise of jurisdiction* based on parental marijuana use alone yet authorize the continuation of out-of-home placement for just such a reason.

Here, father in effect argues that there is no substantial evidence his marijuana use posed a substantial risk to K.N. He points out—without contradiction by the Bureau—all the following: "there were no incidents resulting from Father's use of marijuana. He had no employment issues, he

was perfectly appropriate at visitations, and the social worker never had any concerns that he was under the influence and unable to comprehend when she met with him. The father stated he would not drive after smoking and he had support people if needed. Additionally, as his counsel argued, he could always call an ambulance if there was a serious emergency." Our review of the record confirms this is accurate.

Indeed, the social worker acknowledged in her testimony both that medical marijuana is legal and that a parent can use it safely. She simply testified she wanted father to have a safety plan around his medical marijuana use, and father *did* propose one.[6] The Bureau has not articulated any criticism of his proposed safety plan or shown that it falls short.

The Bureau now argues father used marijuana "excessively." (See *In re N.R.*, *supra*, 15 Cal.5th at p. 540 [construing "substance abuse" for purposes of dependency jurisdiction as meaning "excessive use of drugs or alcohol"].) That mischaracterizes the record. There is no evidence father's twice daily use for managing pain before work and at night was "excessive." Indeed, there was no evidence of how much marijuana he consumed in the morning or at night or whether or how it affected his physical or cognitive abilities. And there was no evidence that his use impaired him at all, much less to a degree that he could not safely care for his child. Thus, there is no substantial evidence he had a substance abuse problem with marijuana (as the juvenile court implicitly ruled when it found those allegations unsubstantiated and dismissed them) or that his substance *use* posed a substantial risk of detriment to K.N.

---

[6] Father's proposed safety plan limited him to using medical marijuana no more than twice a day, prevented him from driving K.N. after using it and required him to store his medical marijuana outside of his home, in a combination locked container.

18

The Bureau also asserts father was "resistant to safety plan[ning] around [his medical marijuana] use" and that was somewhat true. But context matters. As noted, the Bureau had alleged he had a current substance abuse problem with marijuana that put K.N. at risk and yet, at the jurisdiction hearing, the juvenile court found those allegations untrue and dismissed them. Nevertheless, after that, the Bureau never relented in pressing him to justify his medical marijuana use and to "safety plan" around it and insisting that he stop using it altogether. It then held it against him when he expressed that his medical marijuana use had never interfered with his ability to care for his older children, he did not want to reduce his use and did not perceive it as a safety risk for K.N. Despite all this, father did propose a safety plan regarding his use of marijuana. Simply put, father's reluctance to acquiesce in the Bureau's unsubstantiated fears surrounding his marijuana use is not itself substantial evidence that his use of medical marijuana poses a serious safety risk to his young daughter.

The Bureau's concern for the safety of a young child in the care of a parent who once struggled in the grip of addiction is well-intentioned. In the end, however, the record does not show that father uses medical marijuana to excess or in a way that poses a danger to parenting a young child. And the record does show that father has maintained sobriety from methamphetamine for the entire duration of this case (and indeed longer), has not acted in any way during the reunification period that suggests he is likely to allow mother to have contact with K.N. while under the influence of drugs herself, and is willing to abide by reasonable safeguards to ensure K.N.'s safety from mother and from his own use of marijuana if she is returned to his custody. Indeed, the juvenile court concluded at the jurisdiction hearing that father's own marijuana use did not pose a danger to

K.N., yet it did an about-face about 10 months later at the contested review hearing without any basis in the record for doing so. Accordingly, the Bureau did not meet its burden to show that there is a substantial risk of detriment if K.N. were returned to his custody, and the juvenile court erred by concluding otherwise.

We will therefore grant his petition for a writ of mandate. Rather than order K.N.'s immediate return, however, we will direct the court to hold a new review hearing under section 366.21 to consider evidence of any new developments relevant to the question whether returning K.N. to his custody poses a substantial risk of detriment. If no new developments establish a substantial risk of detriment by a preponderance of the evidence, then K.N. must be returned to his custody, with any reasonable orders to ensure her safe return.

## II.
### *Lack of Reasonable Services*

If at the continued review hearing the Bureau does prove a substantial risk of detriment to returning K.N. to father's custody based on new developments, then the juvenile court nonetheless must continue the case for an 18-month review hearing. That is because the Bureau never increased his visits with K.N. or allowed him to have unsupervised visits with her, much less allowed him to have overnight visits with her as the juvenile court had authorized. We thus agree with father he was denied reasonable reunification services.

Extended discussion of this issue is unnecessary. "Visitation is an essential component of a reunification plan. [Citation.] To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child." (*Tracy J. v. Superior Court*, *supra*, 202 Cal.App.4th

at p. 1426.) "When the Agency limits visitation in the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, it unreasonably forecloses family reunification . . . and does not constitute reasonable services." (*Id.* at p. 1427 [holding four hours of unsupervised weekly visitation unreasonable, and granting petition for writ of mandate]; see also *In re M.F.* (2019) 32 Cal.App.5th 1, 17 [social worker's decision to not proceed with planned expanded visitation, including overnight visits and trial home visit period, supports finding that no reasonable services were provided].)

Here, there is no evidence that father engaged in any behavior that did or would jeopardize K.N.'s safety. The Bureau does not address the key facts, which are that the court itself authorized overnight visitation for up to two days at the Bureau's discretion, all of father's supervised visits went well, neither he nor mother ever attended them under the influence of drugs, and both abided by all rules of visitation. Nothing transpired during father's visits that posed the slightest concern about his ability to safely care for K.N. in an unsupervised setting, more frequently, or even overnight.

In defending the curtailment of father's visitation, the Bureau relies only on generalized concerns articulated by the social worker about father's use of medical marijuana and his questioning of mother's drug test results at the time of K.N.'s birth. But, as we have discussed, those concerns were not based on specific, concrete facts. There was simply no evidence supporting the Bureau's suggestions that father would permit mother to have access to K.N. while she was under the influence of drugs, that he might use marijuana to excess while K.N. was in his care or that he might otherwise violate the rules of visitation. Moreover, had his visits been stepped up in frequency and permissiveness (i.e., unsupervised and then, if appropriate,

overnight), it would have supplied more information to the Bureau and the juvenile court about his ability to protect K.N. from mother, which was the primary reason the juvenile court declined to return K.N. to his custody at all.

Simply put, father was never given a chance to demonstrate his ability to maintain appropriate safety boundaries with mother while caring for K.N., and yet his supposed lack of boundaries was the very reason he was deprived of a parental relationship with his child. Accordingly, if the juvenile court does not order K.N.'s return to him as just discussed, it must provide adequate visitation and other services sufficient to enable the Bureau to assess whether he poses any actual risk of detriment. If on remand the juvenile court does not return K.N. to father's physical custody at the continued review hearing we are ordering, then it must direct the Bureau to increase his visitation consistent with the views expressed in this opinion and continue the case for an 18-month review hearing.

## DISPOSITION

The petition for an extraordinary writ is granted. Let a peremptory writ of mandate issue directing the juvenile court to (1) vacate its order setting a hearing for K.N. under section 366.26 and (2) set a continued 12-month review hearing at the earliest date consistent with the views expressed in this opinion and the rights of the parties to prepare their case. In the interest of justice, this decision shall become final as to this court five days from the date it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

The stay of the section 366.26 hearing issued by this court on April 25, 2024, is hereby dissolved.

22

 

 

STEWART, P. J.

We concur.

 

RICHMAN, J.

 

DESAUTELS, J.

 

*N.N. v. Superior Court of Contra Costa County* (A169941)